Honorable Joe Frappier State Senator, District 22 2665 Sorrell Drive Florissant, Missouri 63033
Honorable Wayne Goode State Representative, District 68 7335 Huntington Drive Normandy, Missouri 63121
Dear Senator Frappier and Representative Goode:
This official opinion is in response to your request for a ruling on the following question:
 "Does section 163.031, subsection 8, authorize that the minimum amount of money per pupil in average daily attendance under section 163.031, subsection 4 (Grandfather Clause) be increased as provided in section 163.031, subsection 8, should the general assembly transfer to the state school moneys fund in any year an amount in excess of the amount necessary to pay the school apportionments as provided in section 163.031, subsection 1 and 2, or does section 163.031, subsection 4, merely provide for a minimum amount of money per pupil in average daily attendance and bear no relationship to the distribution of funds in excess of those necessary to fully implement the formula."
DEFINITIONS
The following terms when used in this opinion will have the meanings set forth below:
1. "Foundation Program" — The statutory procedure primarily set forth in Section 163.031, RSMo Supp. 1975, by which the state distributes financial aid to school districts.
2. "Minimum Guarantee" — The amount of money resulting from performing the computation called for by subsection 1 of Section 163.031, RSMo Supp. 1975.
3. "Formula Entitlement" — The amount obtained by subtracting from the minimum guarantee the deduction called for by subsection 2 of Section 163.031.
4. "Grandfather Clause" — Subsection 4 of Section163.031.
5. "Proration Factor" — The percentage by which the money appropriated to and authorized to be spent from the state school moneys fund for the purpose of funding the Foundation Program in any given year exceeds the amount necessary to provide all school districts in the state the amount they are entitled to receive under subsections 1 and 2 and, for the reasons set forth in this opinion, subsection 4 of Section163.031. The statutory basis for prorating the excess funds is subsection 8 of Section 163.031.
6. "Apportionment" — The amount of money allocated to each school district based on Section 163.031.
7. "Average Daily Attendance (ADA)" — This term is defined in Section 163.011 as the:
 ". . . quotient or the sum of the quotients obtained by dividing the total number of days attended of resident pupils in grades kindergarten through twelve, inclusive, and between the ages of five and twenty in a term, by the actual number of days in that term and not including legal school holidays and legally authorized teachers' meetings;"
STATUTORY PROVISIONS
Subsections 4 and 8 of Section 163.031, RSMo Supp. 1975, are of particular importance to this opinion:
 "4. No district shall receive annually, during the biennium beginning in 1969, or thereafter, a less amount per pupil in average daily attendance from the state foundation program fund than it received in 1968-69 from the state appropriation for transportation allowance, special education, flat grant aid, first level equalization, second level equalization and teacher preparation aid.
* * *
 "8. It is hereby provided that should the general assembly transfer to the state school moneys fund in any year an amount in excess of the amount necessary to pay the school apportionment as provided in this section, the additional funds shall be distributed to the school districts of the state in the same ratio that the money available bears to the total amounts received by the school districts under the provisions of this section."
THE PROBLEM
Basically, the problem raised by your question is when,
in computing the amount of state aid a district will receive under Section 163.031, does one consult the district's 1968-69 level of state aid to determine if that amount has been exceeded by the current year's proposed apportionment of state school moneys.
The State Board of Education's Position
Consistently since 1971-72,[1] the State Board of Education has determined a district's apportionment by: a) computing the district's formula entitlement; b) comparing the formula entitlement with the district's 1968-69 level of state aid; and c) applying the proration factor to the formula entitlement or to the 1968-69 level of state aid if it is greater than the formula entitlement. Using the State Board of Education's approach, a hypothetical district's apportionment would be computed as follows:
Example 1
 Step 1 — Computation of the formula entitlement for each student in average daily attendance.
 Minimum Guarantee — $1,000,000 Deductions — 500,000 Formula Entitlement — 500,000 Average Daily Attendance (ADA) — 2,000 Formula Entitlement per ADA — 250
 Step 2 — Computation of the amount of state moneys received by this district for each student in average daily attendance for 1968-69.
 Grandfather Clause amount per ADA — 300
 Step 3 — Computation of the district's apportionment for the current year by applying the proration factor to the Grandfather Clause amount per ADA because it is greater than the formula entitlement per ADA.
 Grandfather Clause amount per ADA — 300 Proration factor — 1.50 Apportionment per ADA — 450 Average Daily Attendance — 2,000 Apportionment of state funds for the current year — 900,000
As the example demonstrates, the State Board of Education determines whether a district's 1968-69 level of state aid will be exceeded in the current year before prorating excess funds. If the 1968-69 level is greater than the district's formula entitlement, the proration factor is applied to the amount received by the district in 1968-69 and not to the amount of the district's formula entitlement for the current year. See Step 3 in Example 1. By applying the proration factor to a district's 1968-69 level of state aid, the district is protected not only from receiving less than it received in 1968-69, but it also shares on the same basis as other districts in the excess funds available under subsection 8.
The State Board of Education relies primarily on the wording of subsection 8 emphasized below to support its position:
 "It is hereby provided that should the general assembly transfer to the state school moneys fund in any year an amount in excess of the amount necessary to pay the school apportionment as provided in this section, the additional funds shall be distributed to the school districts of the state in the same ratio that the money available bears to the total amounts
received by the school districts under the provisions of this section." (Emphasis supplied.)
The State Board of Education argues that the last six words "under the provisions of this section" do not exclude any subsection or provision of Section 163.031. Therefore, because the Grandfather Clause is one of the subsections of Section 163.031, the formula entitlement of each school district in Missouri must be compared to each district's 1968-69 level of state aid before the excess funds are prorated pursuant to subsection 8. Every school district's formula entitlement or 1968-69 level of state aid, whichever is greater, is then added together to determine the denominator of the subsection 8 ratio,[2] i.e. the "total amounts received by the school districts under the provisions of this section."
The Goode-Frappier Position
Those who oppose the State Board of Education's position contend that the Grandfather Clause's only function is to provide a floor below which no district's state aid shall fall. Therefore, whether a district is entitled to Grandfather protection should be determined after both the formula entitlement has been computed and the proration factor has been applied to the formula entitlement. This position can be demonstrated using the same figures as were used in Example 1:
Example 2
 Step 1 — Computation of the formula entitlement per student in average daily attendance.
 Minimum Guarantee — $1,000,000 Deductions — 500,000 Formula Entitlement — 500,000 Average Daily Attendance — 2,000 Formula Entitlement per ADA — 250
 Step 2 — Application of the proration factor to formula entitlement per ADA.
 Formula Entitlement per ADA — 250 Proration Factor — 1.50 Apportionment per ADA — 375
 Step 3 — Determination of whether the district's 1968-69 level of funding per average daily attendance has been exceeded.
 Grandfather Clause amount per ADA — 300 Apportionment per ADA — 375
 Step 4 — Computation of the district's apportionment using the apportionment per ADA because greater than Grandfather level.
 Apportionment per ADA — 375 Average Daily Attendance — 2,000 Apportionment of state funds — 750,000
By comparing Examples 1 and 2, it can be seen that in certain situations consulting the Grandfather Clause after applying the proration factor will reduce the number of districts qualifying for Grandfather Clause protection and will reduce the amount of money some districts will receive.[3] In Example 2, the district's 1968-69 level of state funding is not used in computing the district's apportionment because the district's share of excess funds increases the apportionment per ADA over the Grandfather level. Therefore, the district, under Example 2, receives $150,000 less money than under Example 1 solely because excess funds are allocated before it is determined whether the 1968-69 level of state funding has been exceeded.
It is contended by the proponents of the Goode-Frappier approach that the wording of subsection 4 indicates that a district is not supposed to get less than the Grandfather amount from the "state foundation program fund." The argument is made that the 1968-69 level of funding was intended to provide only a funding floor below which a district could not fall. To permit a district's Grandfather level of funding to be used as the basis for receiving more state aid than was received by a district in 1968-69 is said to be inconsistent with the basic nature of Grandfather clauses, i.e. to protect a designated class (in this case, all districts in existence in the 1969-70 school year and thereafter) from suffering financial loss as the result of the application of a new statutory formula for distributing state financial aid.
Furthermore, the proponents of the Goode-Frappier approach contend that one of the primary purposes of Section 163.031 was to reduce the disparity between wealthy school districts and poor school districts. They argue that under the State Board of Education's approach the equalizing intent of the foundation program is undercut. Some wealthier school districts, (which would not receive much, if any, state aid under subsections 1 and 2 because their large assessed valuations cause them to have large deductions under subsection 2,) receive not only their 1968-69 level of state aid, but, in addition, their prorata share of any excess funds. They illustrate this counter equalizing effect with actual figures from a wealthy Missouri school district.
Example 3
 STATE BOARD OF EDUCATION APPROACH
 Step 1 — Compute formula entitlement per student in average daily attendance.
 Minimum Guarantee — $ 782,608 Deductions — 1,654,200 Formula Entitlement — 0 Average Daily Attendance — 1,883.11 Formula Entitlement per ADA — 0
 Step 2 — Compute 1968-69 amount received by this district per student in average daily attendance.
 Grandfather Clause amount per ADA — 184.41189
 Step 3 — Compute the district's apportionment of state funds for the current year using the Grandfather amount per ADA because it is larger than the formula entitlement per ADA.
 Grandfather Clause amount per ADA — 184.41189 Proration Factor — 1.541781 Prorated Grandfather Clause amount per ADA — 284.32275 Average Daily Attendance — 1,883.11 Apportionment of state funds for the current year — 535,411
Adherents of the Goode-Frappier approach note that under the State Board of Education's approach this wealthy district is not only protected by the Grandfather Clause from receiving less state aid than was received in 1968-69 (their view of the intended function of the Grandfather Clause), but the district also shares in the excess funds because the proration factor is applied to the 1968-69 level of state funding.
Example 4
 GOODE-FRAPPIER APPROACH
 Step 1 — Compute formula entitlement per ADA.
 Minimum Guarantee — $ 782,608 Deductions — 1,654,200 Formula Entitlement — 0 Average Daily Attendance — 1,883.11 Formula Entitlement per ADA — 0
 Step 2 — Apply proration factor to formula entitlement per ADA.
 Formula Entitlement per ADA — 0 Proration Factor — 1.5417 Prorated Formula Entitlement — 0
 Step 3 — Consult this district's 1968-69 level of funding to determine if it was in excess of the prorated formula entitlement for the current year.
 Grandfather Clause amount per ADA — 184.41189 Average Daily attendance — 1,883.11 Apportionment of state funds for the current year — 347,268
Under their approach, Goode-Frappier note that this wealthy district is protected by the Grandfather Clause from receiving no state school aid, but does not get to use their 1968-69 level as a springboard to an even greater share of state moneys at the expense of less wealthy districts. Goode-Frappier note that this result is entirely consistent with both the purpose of a Grandfather Clause and what they believe the General Assembly intended in adopting Section 163.031, i.e. to equalize the disparity between wealthy and poor districts.
DISCUSSION
The purpose of this legal opinion is to attempt to predict how a Missouri appellate court would rule if presented with the problem posed by this opinion request. We have been able to find no cases in Missouri or in any other jurisdiction interpreting language similar to Section 163.031 to serve as a guide to predicting how a Missouri court might rule on this question. Therefore, we must resort to general rules and guidelines obtained from Missouri appellate court decisions involving different factual situations.
The primary task of a court in determining whether a particular course of action is permitted or prohibited under a statute is to attempt to ascertain the intent of the legislature in enacting the particular language in question. Primary reliance is placed on the language used by the General Assembly.
 "`In the interpretation of statutes, words in common use are to be construed in their natural, plain, and ordinary signification. It is a very well settled rule that so long as the language used is unambiguous, a departure from its natural meaning is not justified by any consideration of its consequences, or of public policy, and it is the plain duty of the court to give it force and effect.'" Betz v. Kansas City Southern Railroad Company, 284 S.W. 455, 461 (Mo. 1926).
 ". . . It is a familiar rule that where the language of a statute is plain and admits of but one meaning there is no room for judicial construction. Rathjen v. Reorganized School Dist. R-11 of Shelby County, 365 Mo. 518, 284 S.W.2d 516; Cummins v. Kansas City Public Service Co., 334 Mo. 672, 66 S.W.2d 920. And under the guise of judicial interpretation we have no right to change the meaning of a plain and unambiguous statute. Steggall v. Morris, 363 Mo. 1224, 258 S.W.2d 577." McLaurin v. Frisella Moving and Storage Company, 355 S.W.2d 360, 364
(Mo.App. 1962).
The words used by the General Assembly in subsection 8 of Section 163.031 are clear and unambiguous.[4] "Additional funds" are to be "distributed to the school districts of the state in the same ratio that the money available bears to the totalamounts received by the school districts under the provisionsof this section." The State Board of Education is not authorized by this language to ignore or disregard any provision of Section 163.031 in determining the "total amounts" received by the school districts of the state. The words "total amounts" and "under the provisions of this section" are unambiguous; the direction given by these words is explicit. The State Board of Education is not authorized to ignore the natural meaning of this language because of arguments as to the consequences of giving the language its natural meaning.
The State Board of Education is required by this language to initially determine the total amount of state aid all school districts in the state are entitled to "under the provisions of" Section 163.031. Subsection 4 is one of those provisions and no amount of conjecture about what individual legislators thought in 1969 can alter that fact. Once the total amount received by the school districts of the state under the provisions of Section 163.031 has been computed, the ratio between that figure and the amount available for distribution from the state school moneys fund is then computed.[5] All districts then receive their prorata share of the additional funds by multiplying their individual total amounts times the proration factor.
Even if the wording of subsection 8 would be found by a court to be ambiguous (see Footnote 2), the:
 ". . . interpretation given an ambiguous
statute by an agency or branch of government charged with its execution or administration is entitled to great weight in judicially ascertaining legislative intent, and, concomitantly, in resolving the statutory ambiguity. Foremost-McKesson, Inc. v. Davis, 488 S.W.2d 193, 197
(Mo. banc 1972); State ex rel. Curators v. Neill, 397 S.W.2d 666, 670 (Mo. banc 1966); and State ex rel. Harline v. Public Service Commission of Missouri, 343 S.W.2d 177, 182, 183 (Mo.App. 1960). . . ." State ex rel. School District of Kansas City v. Young, 519 S.W.2d 328, 333
(Mo.App. 1975).
As previously noted, the State Board of Education has consistently since the 1971-72 school year (the first year there were excess funds to distribute pursuant to subsection 8) applied the proration factor to a district's 1968-69 level of state aid if greater than the current year's formula entitlement.
We are not unmindful of the policy arguments advanced by the proponents of the Goode-Frappier approach. There can be no question the General Assembly's primary purpose in providing for the deductions in subsection 2 was to equalize in part the disparity between wealthy and poor school districts. See State ex rel. School District of Kansas City v.Young, supra. However by enacting the Grandfather Clause, the General Assembly partially undercut the equalization achieved by the deduction in subsection 2. Certainly that is the effect of assuring certain wealthy school districts that if their deductions, which are based primarily on local wealth, are so great that they exceed the minimum guarantee, these districts will still get the same amount of state aid they received in 1968-69. Therefore, it becomes quite difficult to argue that the wording of subsection 8, if given its natural meaning, runs counter to a general equalizing intent for Section 163.031. To interpret subsection 8 as is done in this opinion does in some instances reduce further the equalization accomplished by subsection 2 but true equalization had already been dealt a body blow by the enactment of the Grandfather Clause.
If the General Assembly in light of the changed circumstances occurring since 1969, i.e. yearly funding of the foundation program in excess of one hundred percent and the State Tax Commission's apparent intention to certify more realistic ratios to the State Board of Education, desires greater equalization, one of two courses of action is readily available. The General Assembly could repeal the Grandfather protection afforded by subsection 4 or it could phase out Grandfather protection over a period of years. Another way to achieve the kind of equalization advocated by the proponents of the Goode-Frappier approach would be to amend the language of subsection 8 by inserting immediately before the last two words of the subsection the words, "Subsections 1 and 2 of."
CONCLUSION
Therefore, it is the conclusion of this office that in determining the "total amounts received by school districts under the provisions of this section" as required by subsection 8 of Section 163.031 the State Board of Education must take into account for any district entitled thereto the protection afforded by subsection 4 of Section 163.031.
The foregoing opinion, which I hereby approve, was prepared by my assistant, D. Brook Bartlett.
Very truly yours,
 JOHN C. DANFORTH Attorney General
[1] The 1971-72 school year was the first year that the General Assembly transferred to the school moneys fund an amount in excess of what was needed "to pay the school apportionment as provided in . . ." Section 163.031. The proration factor for that year was 1.03962. In 1970-71 and 1969-70, the proration factors were .73727 and .77721, respectively.
[2] The proration factor is determined as follows:
total amount appropriated to and authorizedto be spent from school moneys fund = proration factor "total amounts received by the school districts under the provisions of this section"
[3] If the Goode-Frappier approach had been utilized in the 1975-76 school year, the number of districts qualifying for Grandfather protection would have been reduced from 87 to 44 according to information supplied by the State Department of Elementary and Secondary Education. The State Department of Elementary and Secondary Education advises that if the Goode-Frappier approach had been used in the 1975-76 school year 81 school districts would have received smaller apportionments totalling $3,939,663, which amount is 1.1% of the total state funds apportioned to Missouri school districts. This amount would have been divided among the remaining 482 districts on a prorata basis. The largest single reduction would have been $472,466.
[4] ". . . `Language is ambiguous where it is susceptible of interpretation in opposite ways.' J. E. Blank v. Lennox Land Co., 351 Mo. 932, 174 S.W.2d 862, 868 (banc 1943). More directly in point, `[a] statute or portion thereof is ambiguous when it is capable of being understood by reasonably well-informed persons in either of two or more senses.' State v. Lucas, 24 Wis.2d 262, 128 N.W.2d 425, 428 (1964)." Stateex rel. School District of Kansas City v. Young, 519 S.W.2d 328,331 (Mo.App. 1975).
[5] In the 1975-76 school year, the computation of the ratio ("proration factor") was as follows:
 $341,810,539 = 1.549554 ------------ $220,586,400